Daniel Olmos (CA SBN: 235319)



600 University Avenue
Palo Alto | CA | 94301
T 650.326.2980 | F 650.326.9704
dolmos@nbo.law

Attorney for Defendant
*Xiaolang Zhang*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>XIAOLANG ZHANG,<br><br>　　　　　Defendant. | Case No.: 5:18-CR-00312-EJD<br><br>**SENTENCING MEMORANDUM**<br><br>Date:　February 5, 2024<br>Time:　1:30 PM<br>Dept:　Hon. Edward J. Davila |

    Defendant Xiaolang Zhang, through counsel, respectfully submits this Sentencing Memorandum to assist the Court with respect to the February 5, 2024, sentencing hearing in this matter. Mr. Zhang requests that the Court take into consideration this memorandum in determining a reasonable, just, and appropriate sentence in this case.

**I.　PROCEDURAL HISTORY**

    Mr. Zhang is charged by Indictment with a single count of theft of trade secrets, in violation of 18 U.S.C. § 1832(a)(1). *See* Docket No. 5. The gravamen of the allegations is that, while employed by Apple, Mr. Zhang downloaded a document containing information constituting

trade secrets belonging to the company.  There is no evidence or allegation that Mr. Zhang ever provided any Apple trade secret information to any third party.  On August 22, 2022, Mr. Zhang pled guilty to the single count pursuant to a plea agreement.  *See* Docket No. 72.  That plea agreement is sealed.  *Ibid*.

## II. SOCIAL HISTORY

### A. Childhood

Xiaolang Zhang was born on September 28, 1985, to Fuying Liu and Fengchan Zhang in a small village called Lipishang in southeastern China.  The village of less than fifty households is within the boundaries of Ji'An, a prefecture-level city situated in the central region of Jiangxi province.  The prevailing lifestyle in Lipishang was rural and self-sufficient.  Enclosed by mountains, residents of Lipishang grew and produced their own food for consumption and sale outside of the village.  Both of Xiaolang's parents were rice farmers.  Other residents grew vegetables like carrots and leafy greens, while others looked after the livestock of the village.  Since he was a young child, Xiaolang and his siblings worked alongside their parents during biannual rice seasons.  Xiaolang was very close with his three brothers: Xioaquiang, Xiaoyong, and Xiaokang.  Each boy is about two years apart in age.  Farm work was physically demanding, but the boys bonded over the shared goal.  Outside of rice season, the family gardened recreationally, cooked meals together, and camped in the mountains.  Often, the electricity in the village would go out.  On those nights, the family would sing Buddhist hymns.  Xiaolang's parents were always practicing Buddhists but became increasingly connected to the religion throughout Xiaolang's life.

Xiaolang started attending school at the age of eight.  Unlike in major Chinese cities, there was no state-supported schooling prior to elementary school.  The nearest school was a 30-minute walk from his home.  Xiaolang immediately took a liking to formal education.  Learning made him feel both relaxed and accomplished and he reveled in the interaction with children from other families.  Because the school was insufficiently funded, students had to be resourceful when it

came to entertaining themselves.  Each child brought a new toy or game to share with their classmates.

As Xiaolang approached the third grade, the school was equipped with a brand-new library.  Around this time, as a part of a state-sanctioned program that sent government employees from Shanghai to small villages to author papers about conditions in the countryside, a man named Jian Feng Xia arrived and donated much of the library's content.  Jian Feng Xia also spearheaded the school's English program.  Jian Feng Xia's presence in the village was the most obvious demonstration of the impact of China's Cultural Revolution.

### B. Adolescence

Xiaolang was a top performer in all academic subjects, particularly mathematics.  Academic success came effortlessly to Xiaolang, who consistently earned high marks.  Outside of class, Xiaolang played flute in the school's band.  Xiaolang's successes brought immense pride to his parents, neither of whom could read or write.  Despite never having obtained an education themselves, Xiaolang's parents prioritized schooling.  They valued knowledge and understood its capacity to change the trajectory of their sons' lives. While many parents in the village pulled their children out of school after only a couple years, Xiaolang's parents insisted that their children remain in school for as long as possible.

In China, students are to take state-administered examinations before progressing to a higher level of schooling.  The examinations are intended to place students in institutions that are suitable to their academic proficiency and, among the highest scorers, to rank the country's most precocious children.  Following the examination administered at the conclusion of elementary school, Xiaolang's exemplary scores earned him a place in the most esteemed middle school in the county.

Xiaolang's placement required him to move away from home and live in the town adjacent to school.  The transition was difficult for Xiaolang, who was only fourteen at the time.  Even so, Xiaolang continued to perform remarkably well in school such that his teachers began to take note of his aptitude.  At the conclusion of middle school, Xiaolang was the top scorer in his county out

1  of more than 5,000 students in his age group.  Nationally, Xiaolang earned third place among all
2  students in China.  Xiaolang's parents and brothers were elated.  Xiaolang gained celebrity status
3  within his village and county.  He was promptly offered a position at a high school in the nearest
4  city, which was a few hours away by bus.  In order to stay closer to home, Xiaolang accepted
5  another offer of a full scholarship to the best high school within his county.

6  When Xiaolang started high school, he began to think critically about his future.  At the
7  encouragement of his uncle, Xiaolang decided to pursue a career in engineering upon graduation
8  from high school.  In order to qualify, students were subjected to an extremely rigorous three-day
9  examination.  Xiaolang earned admittance to Southeast University, an elite university located in
10 Nanjing, China.  Southeast University was one of a handful of universities sponsored by China's
11 Ministry of Education in an effort to become a world-class institution, and is known for its
12 engineering programs.

13     **C.**    **University and Graduate Degree**

14 Xiaolang began freshman year as an intended electrical engineering major.  He picked up
15 on the new material quickly, proving to be naturally adept at programming and coding.  By his
16 third year, Xiaolang had honed his academic focus on analog circuit design, which focuses on the
17 part of an integrated circuit that filters and amplifies signals.

18 Although there were plenty of jobs in the circuit design market, Xiaolang knew that he
19 would have to obtain a graduate degree if he were to be a competitive candidate.  In his fourth
20 year, he began to prepare for graduate admittance exams.  Following graduation, Xiaolang stayed
21 on campus to conduct research and prepare his graduate school applications.  He applied to
22 schools in Canada, Switzerland, and Australia.  To his relief, Xiaolang was accepted into a
23 prestigious circuit design program at the University of British Columbia, where he began graduate
24 studies in 2009 at the age of 25.

25 Xiaolang's two-year masters project involved the production of power line
26 communications systems in vehicles.  Xiaolang authored a research paper on his studies that was
27 published by the Institute of Electrical and Electronics Engineers in their International Symposium
28

on Circuits and Systems.  Upon graduation in 2011, Xiaolang had worked tirelessly to put himself in a respected professional position.  He accepted an internship with PMC-Sierra, a semi-conductor company in Burnaby, Canada.  He began temporary work there as a layout and circuit designer for communications devices until October 2011, when he moved to Santa Clara, California.

### D. Employment History and Personal Life

Xiaolang started his first full-time employment with Marvel Technology Group, a producer of storage, processing, networking, security, and connectivity devices headquartered in Santa Clara.  Because he'd always intended to pursue a career in the United States, Xiaolang was thrilled.  The work, though challenging, was interesting to Xiaolang, who found himself in a professional groove for the first time.

Two years into his four-year career at Marvel, Xiaolang was introduced to his future wife, Qianqian Shi, through mutual friends.  At the time, Qianqian was training and working in China as a nurse.  At the suggestion of close friends, Xiaolang and Qianqian established contact online.  They got along well enough that Xiaolang decided to return to China to meet Qianqian in person.  He arrived in China during the winter of 2013, and the pair took a weeklong vacation to Wuzhen, one of the country's most historic destinations.

After their trip, the couple decided that they would seriously pursue a relationship together.  Qianqian visited Xiaolang twice in 2014, first to travel on vacation to San Diego, and later, for Christmas.  Though maintaining a long-distance relationship proved difficult, they became engaged in 2015 and were married in early 2016.  Their families and friends convened in Hangzhou, a major city outside of Shanghai in East China, to celebrate the momentous occasion.  Qianqian officially moved to the U.S. in the fall 2016, nearly a year after Xiaolang was recruited and hired by Apple.  The couple's first child, Eilan, was born on August 1, 2017.  They welcomed their second child, Eileen, on May 20, 2022.  Eilan attends kindergarten at Stratford School in Milpitas, and has adjusted well to his new school.  Based on his teachers' feedback, Eilan is a social, warm-hearted student who is willing to speak up and help others when he sees something

that is not right.  He has been a student leader and helper for his peers.  Xiaolang is the sole financial provider for his young family.

### E.     History with Apple Inc.

In late February of 2015, Xiaolang sent a request to connect on LinkedIn to a recruiter at Apple.  Xiaolang ultimately joined Apple on December 7, 2015, as an Analog Engineer.  Xiaolang got along exceptionally well with his coworkers and consistently received exemplary reviews from his managers.  In a performance review in June 2017, Xiaolang received a rating of "exceeded expectations" in the categories of Teamwork and Results and a rating of "achieved expectations" in the category of Innovation.  Until the events giving rise to this case, Xiaolang had displayed strong leadership skills and had made great progress toward further promotion.

### F.     Employment Since Arrest

Since his termination from Apple, Xiaolang has continued to work to support his family.  In October 2018, he began work at ASML, a semiconductor company, as a Grade 8 circuit design engineer.  In this role, Xiaolang designed SEM (scanning electron microscope) products.  Due to his hard work and capabilities, Xiaolang excelled quickly and was promoted to a Grade 9 engineer less than a year and a half after starting at ASML.  After his promotion, he was given a wider scope of responsibility, including a leadership role over a ten-person team.

At the end of August 2022, Xiaolang made the transition from ASML to another leading semiconductor company in Silicon Valley.  While Xiaolang enjoyed his time at ASML, his new employer offered a higher wage and supporting his family is Xiaolang's main concern.  He is a circuit design engineer at his new company.  With his level of expertise and experience, Xiaolang was able to begin his work with his new company with minimal training and supervision.

### G.     Conclusion

Xiaolang is a kindhearted, ambitious, and honest individual.  He is deeply committed to his wife, children, and professional aspirations.  Having come from modest means, Xiaolang takes nothing for granted, and instead works tirelessly in pursuit of his goals.  Each of the accomplishments Xiaolang has thus experienced are the result of his direct efforts and

1  unparalleled work ethic.  His young family is his primary source of motivation to remain
2  optimistic in the face of looming challenges.
3  **III.     DISCUSSION**
4        **A.     Sentencing Guidelines and the Economic Loss Table**
5        The United States Sentencing Commission was charged by Congress with the task of
6  establishing guidelines that would carry out the basic sentencing objectives contained in 18 U.S.C.
7  § 3553(a).  *See United States v. Rita*, 551 U.S. 338, 347 (2007).  Those objectives include *inter*
8  *alia* "certainty and fairness," avoiding unwarranted sentencing disparities, and permitting
9  "individualized sentences when warranted by mitigating or aggravating factors not taken into
10 account in the establishment of general sentencing practices." *Id*. at 348.  The primary tool used
11 by the Commission in creating the Sentencing Guidelines, the product of its congressional
12 mandate, was extensive and thorough examination of empirical data that included "tens of
13 thousands of sentences." *Id*. at 349; *see also Gall v. United States*, 552 U.S. 38, 46 (2007)
14 (acknowledging that the Sentencing Guidelines are "the product of careful study based on
15 extensive empirical evidence derived from the review of thousands of individual sentencing
16 decisions").
17       Section 2B1.1's economic loss enhancement, however, is entirely untethered from its
18 empirical roots and has lost the confidence of many jurists. *See generally* Barry Boss & Kara
19 Kapp, *How the Economic Loss Guidelines Lost its Way, and How to Save It*, 18.2 Ohio St. J. of
20 Crim L. 605 (2021).  The following is a brief summary of the history of § 2B1.1's economic loss
21 guideline, which is described in far greater detail in Mr. Boss and Ms. Kapp's article.
22       In cases in which the government can prove the intended or actual loss resulting from an
23 economic offense, the sentencing calculation includes an enhancement under § 2B1.1's economic
24 loss table. *Id*. at 608.  The enhancement calculations in the loss table are critical because they can
25 single-handedly drive the severity of sentences imposed on economic crime offenders. *Id*.  In
26 preparing the initial loss table, which was previously located in § 2F1.1, the Commission reviewed
27 presentence reports from 10,000 prior cases in 1984. *Id*.  However, after reviewing the empirical
28

data, the Commission deviated in two substantial ways from its standard practice of anchoring the Guideline ranges in the empirical data. *Id*. at 609. First, the Commission excluded from its analysis every sentence in which a judge had imposed a sentence of probation, which accounted for approximately 50 percent of the total data considered. *Id*. Second, even after excluding half of the relevant data, the Commission chose to recommend more severe sentences than the mean sentences of incarceration reflected in the remaining data. *Id*.

The resulting economic loss table topped out at $5 million, with enhancements increasing by one point for every loss bracket. *Id*. Under this initial table, a first-time offender involved in an economic offense with a $1 million-plus loss amount, with no applicable enhancements other than loss, would have faced an Offense Level of 15 and a Guideline range of 18 to 24 months. *Id*. at 610. A similarly-situated offender with a $20 million-plus loss amount would have faced an Offense Level of 17 and a Guideline range of 24 to 30 months. *Id*. "The Commission's initial deviations from the underlying empirical data thus resulted in modest increases in the severity of sentences, but these initial ranges were far from the arbitrary, disproportionate, and at times draconian sentences produced under today's loss table." *Id*.

Since the initial loss table was created, there have been three significant amendments that have dramatically increased the severity of sentences for economic offenses under § 2B1.1. The first of these amendments occurred in 1989, in the wake of the savings and loan fraud crisis. The new table increased enhancements for losses greater than $40,000 and extended the loss table by four brackets, now topping out at $80 million. *Id*. Under this revised table, a first-time offender with a $1 million-plus loss amount would face an Offense Level of 17 and a Guideline range of 24 to 30 months, the range that was previously reserved for offenders with a $20 million-plus loss amount. *Id*. at 611. A first-time offender with a $20 million-plus loss amount would face an Offense Level of 22 and a Guideline range of 41 to 51 months. *Id*. Those offenders in the top bracket with a $100 million-plus loss amount would face an Offense Level of 24 and a Guideline range of 51 to 63 months. *Id*. This was more than double the range from the initial economic loss table.

In 2001, as part of the Commission's "Economic Crime Package," the Commission merged three guidelines and made the economic loss table even more severe. *Id*. The new table used two-level increments instead of the former one-level increment for each loss bracket, and increased the enhancement severity for losses greater than $400,000. *Id*. at 611. Under the new table, a first-time offender with a $1 million-plus loss amount would face an Offense Level of 22 and a Guideline range of 41 to 51 months. *Id*. A first-time offender with a $20 million-plus loss amount would face an Offense Level of 28 and a Guideline range of 78 to 97 months. *Id*. At the highest end, a first-time offender with a $100 million-plus loss amount would face an Offense Level of 32 and a Guideline range of 121 to 151 months, more than double the range from the previous economic loss table. *Id*.

The final significant amendment to the loss table occurred in 2003, after the passage of the Sarbanes-Oxley Act. In addition to increasing the base offense level from 6 to 7, the Commission extended the loss table by two brackets, making the highest loss bracket greater than $400 million. *Id*. at 612. A first-time offender with a $400 million-plus loss amount would face an Offense Level of 37 and a Guideline range of 210 to 262 months. *Id*. at 613.

In 2015, the Commission issued amendments to § 2B1.1 that moderately addressed the concerns raised about the operation of the economic loss table. *Id*. at 613. The most significant changes were a narrower interpretation for "intended loss" and an adjustment to the loss ranges to account for inflation. *Id*. However, these changes did little to correct the underlying problem—that the loss table is entirely divorced from the empirical data that informed its creation.

The gulf between the recommended Guideline sentences and any grounding in empirical data has resulted in a broad judicial consensus that § 2B1.1's economic loss table very often overstates defendants' culpability. *See, e.g.*, *United States v. Gupta*, 904 F.Supp.2d 349, 351 (S.D.N.Y. 2012) ("By making a Guidelines sentence turn on this single factor, the Sentencing Commission ignored [§ 3553(a)] and . . . effectively guaranteed that many such sentences would be irrational on their face."); *United States v. Parris*, 573 F.Supp2d 744, 745, 747-48 (E.D.N.Y. 2008) ("[W]e now have an advisory guidelines regime where, as reflected by this case, any officer

or director of virtually any public corporation who has committed securities fraud will be confronted with a guidelines calculation either calling for or approaching lifetime imprisonment."); *United States v. Adelson*, 441 F.Supp.2d 506, 509 (S.D.N.Y. 2006) ("What drove the [] calculation in this case, more than any other single factor, was the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss.")  Thus, defendants sentenced under § 2B1.1 are frequently sentenced below the applicable Guidelines range, and almost never sentenced above it.  Boss & Kapp, *supra*, at 620-622.

In *Kimbrough v. United States*, 552 U.S. 85 (2007), the Supreme Court addressed another area in which the Sentencing Guidelines had departed from the empirical data.  At issue in *Kimbrough*, of course, was the Guidelines' disparate treatment of crack- and powder-cocaine convictions, which the Court noted was derived by the Commission not through the preferred method of empirical analysis but, rather, as a result of Congressional direction.  *Id*. at 96-97.  Mr. Kimbrough pled guilty to several charges relating to the distribution of crack cocaine, and his Guidelines range was 228 to 270 months, with a statutory minimum prison term of 15 years.  *Id*. at 5.  The district court sentenced Mr. Kimbrough to the statutory minimum largely on the basis of its disagreement with the Guidelines' treatment of crack cocaine, and its finding that, under § 3553(a), any greater sentence would not accomplish the statute's goals.  With respect to the latter finding, the court noted that Mr. Kimbrough had no criminal history and had a long record of steady employment.  With respect to the former, the district court rejected the Sentencing Guidelines on the following basis:

> Congress established the Commission to formulate and constantly refine national sentencing standards. Carrying out its charge, the Commission fills an important institutional role: It has the capacity courts lack to base its determination on empirical data and national experience, guided by a professional staff with appropriate experience . . . The crack cocaine Guidelines, however, present no occasion for elaborative discussion on this matter because those Guidelines do not exemplify the Commission's exercise of its characteristic institutional role. In formulating Guidelines ranges for crack cocaine offenses, as we earlier noted, the Commission looked to the mandatory minimum sentences set in the 1986 Act, and did not take account of empirical data and national experience.

*Id*. at 108-09 (internal citations and quotations omitted).  The Supreme Court upheld the trial

court's sentencing decision and the bases therefor.

*Kimbrough* was the first explicit acknowledgement by the Supreme Court that, in some areas, the Sentencing Guidelines have failed to fulfill its key function of "reflect[ing] a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Id*. at 109-110. The defense submits that this is the case for § 2B1.1's economic loss chart. In the case of Mr. Zhang, the loss amount enhancement comprises more than 70 percent of the Adjusted Offense Level, disproportionally and unreasonably inflating the applicable Guidelines range. Therefore, Mr. Zhang respectfully requests that this Court view the Sentencing Guidelines in this case with the same skepticism as did the district court in *Kimbrough*, as the same deficiencies exist in the Guidelines' treatment of economic offenses under § 2B1.1 as the court highlighted with respect to crack-cocaine cases.

**B.    18 U.S.C. § 3553(a)**

This Court must consult the Sentencing Guidelines in considering a fair and just sentencing for Mr. Zhang, but it should be guided primarily by the factors enumerated in 18 U.S.C. § 3553(a). *United States v. Gall*, 552 U.S. 38 (2007). Pursuant to § 3553(a), this Court must fashion a sentence that is sufficient but not greater than necessary to comply with the purposes of the statute.

Under § 3553(a)(1), both the nature and circumstances of the offense and the history and characteristics of Mr. Zhang support a probationary sentence. Prior to the conduct giving rise to this case, Mr. Zhang lived a productive and crime-free life. Mr. Zhang has, through hard work and dedication, lifted himself from difficult circumstances in China and established himself as a talented and valuable engineer. Mr. Zhang is a dedicated husband and father, and strives every day to do what is necessary to provide a good life for his family. In her letter of support attached as Exhibit 1, Mr. Zhang's wife Qianqian Shi describes all that Mr. Zhang does to support their family. The conduct in this case was an isolated incident in his life, and there is little risk that he will re-offend. In a written statement provided to the Probation Office during the presentence investigation, Mr. Zhang stated that he feels "extremely sorry" and regrets that his conduct put Apple at risk of financial loss. He stated that he is ashamed by his conduct, and feels that he has

1   failed his family and friends.  Qianqian's letter also describes how difficult these past five years
2   have been for their family as a result of this case.  Despite those difficulties, however, Mr. Zhang
3   is resolute in his desire to get their life back on track.

4       While the circumstances of the offense are serious, Mr. Zhang's case-related conduct from
5   early on in this matter demonstrates his sincere remorse.  Moreover, there is no evidence or
6   allegation that Mr. Zhang ever gave Apple trade secrets to any third party.  Nevertheless, Mr.
7   Zhang is sorry for his behavior and understands that his conduct was harmful to Apple.

8       Next, under § 3553(a)(2), the Court should consider the need for the sentence to adequately
9   reflect the severity of the crime, provide sufficient deterrence, and protect the public from danger.
10  A probationary sentence would adequately reflect the severity of Mr. Zhang's conduct.  Following
11  his arrest in July 2018, Mr. Zhang has been under the supervision of pretrial release and has been
12  required to wear an ankle monitor.  Considering the five years already spent with an ankle
13  monitor, and the financial impact this case will continue to have on Mr. Zhang and his family, a
14  probationary sentence is sufficient to deter others who might otherwise emulate Mr. Zhang's
15  conduct in this case.  Finally, Mr. Zhang poses no danger to the community.  Prior to this offense,
16  Mr. Zhang lived a productive and crime-free life, and he has done so since the advent of the case.

17      Under § 3553(a)(7), the Court should consider the need to provide restitution to victims.
18  In the plea agreement, Mr. Zhang agreed to pay restitution to Apple in an amount no less than
19  $146,984.00.  While this is a substantial amount of money, especially for a single-income
20  household, Mr. Zhang is committed to making good on his agreement to pay restitution, and views
21  this as a chance to repair some of the harm caused by his conduct.  Mr. Zhang is currently
22  employed by a leading Silicon Valley company as a circuit design engineer.  A probationary
23  sentence would allow Mr. Zhang to maintain this employment and begin paying the restitution he
24  agreed to pay to Apple.

25      Xiaolang Zhang is committed to rebuilding his life, and to focusing his efforts towards
26  being a supportive husband and father.  The defense submits that, pursuant to § 3553(a), a
27  probationary sentence would be a reasonable, just, and appropriate sentence for Mr. Zhang.  A
28

probationary sentence would be sufficient but not greater than necessary to comply with the purposes of sentencing as set forth in 18 U.S.C. § 3553(a), while allowing Mr. Zhang to pursue these admirable and long-delayed goals.

### C.  Restitution

Mr. Zhang has agreed to pay restitution to Apple in an amount to be set by the Court at the time of sentencing, but in no event less than $146,984.00.  As discussed in Section IV.B. above, this is a significant amount of money, especially for a single-income household.  Regardless, Mr. Zhang intends to make this payment in full.  Mr. Zhang asks the Court to order restitution in the amount of $146,984.00.

### D.  Voluntary Surrender

Upon sentencing, if the Court orders a term of imprisonment, Mr. Zhang respectfully requests that the Court allow him to self-surrender on a date that the Court deems appropriate.  Mr. Zhang has been compliant with the terms of his pretrial release, and the Probation Office recommends voluntary surrender.  Mr. Zhang is not a flight risk—he has kept all court appearances and complied with Pretrial Services for more than five years.  Moreover, Mr. Zhang and his family have established a life in Santa Clara, and intend to remain there after the resolution of this case.

## IV.  CONCLUSION

For the foregoing reasons, Mr. Zhang requests that the Court impose a probationary sentence and order restitution in the amount of $146,984.00.

DATE: January 29, 2024                                    Respectfully submitted,

                                                                                    /s/ Daniel Olmos
                                                                                    Daniel Olmos
                                                                                    *Attorney for Defendant Xiaolang Zhang*

Sentencing Memorandum; Case No. 5:18-CR-00312-EJD

# EXHIBIT 1

*United States v. Xiaolang Zhang*
Case No. 5:18-CR-00312-EJD
Sentencing Memorandum

To: the honorable Judge ….

Thank you so much for reading this letter.

This is Qianqian Shi,  Xiaolang Zhang's wife. In our family, we also have a 6-year old son and a 1.5-year old daughter. I am writing this letter with the hope that your honor can know more about my husband and our family, and the current situation our family is facing.

Like every other family that has immigrated to the USA, we were very thankful to have the opportunity to live in a country with freedom and rights. We were in the smooth process of building our family in the USA and everything went well until he was charged in this case in July, 2018.

He felt despaired when this came out, and in his mind, he believed he had severely damaged Apple's trust on him, and could have harmed the company financially; he also believed he had ruined his own career life, and hurt me and our less than 1-year old son at that time, and failed his other family members, friends, co-workers.

He felt so sorry about what he had done to the company that he showed all his good intentions and cooperated with the company at the very beginning and later with the law enforcements and prosecutors, trying to minimize any negative impacts to the company. He also told me personally that he would never interview for any job in the same field anymore.

He felt ashamed of his action and he believed that a person with a good education and being trained professionally should not have done such a wrong thing. I can see this has caused his hesitation on doing a lot of things, for example, making new friends, joining my son's playdate with other families.

With all that has happened and the support from our family, he accepted to plead guilty to take full responsibility and will try his best to make up for the loss.
Life has been very tough in the past more than five years. The long lasting case has placed not only a lot of financial burden on my family but also a lot of psychological burden on my husband. The COVID time had made everything even worse, and I was very sad to see my husband's loss of his family members, especially his beloved grandmother that he could not go back to see her. But even life has been this tough, I am very pleased to see he still staying strong, and fully supporting our family:

1. The extremely high and long-lasting stress has caused a lot of changes to him and me, but luckily he was willing to accept psychiatrist therapies and take necessary medication. His open mind to have more conversations with me is also a very good way to maintain a good relationship between us.

2.  What makes me more relieved is, no matter what had happened, my husband and I were able to keep everything between us, as if we had created a shell and used it to protect our lovely kids from being impacted from outside.

He is the only one around me that can keep a weekly phone call for many years with the parents in China to make sure they are all well. No matter how busy his job was, he had been trying his best to allocate dedicated time to our kids. He had his own plan and had executed it quite well: he was the one to get my son up in the morning and drove him to the school. In the summer, he was able to bring the kids, especially my son, to outside activities daily. In the winter, he spent the similar time with the kids, mostly at home after he was off. On the weekends, he devoted at least one day for our family to enjoy the family time in the park, hiking, etc.. He helped my son with his homework and had daily story time with him (one of my son's favorite parts is his dad's story time). To our daughter, he even showed more patience and love. Now I am seeing as long as my husband gets home, they both loudly call "Daddy" the moment he opens the door downstairs, and then my little daughter will standby and ask for a hug once she sees him.

On the other hand, my son has a chronic cough over a year and is diagnosed with ADHD, who need more care from our family and community. My husband has been actively participating in his treatment. For example, my husband and I attended parenting counseling to learn how to take care of an ADHD kid better. He does follow up my son's health condition by participating doctor's appointments and talking with me on the next plans.

He respected my career dream and supported me in nursing school, even though we were experiencing more financial stress. From the bottom of his heart, I can see he still wants to be a good engineer, an engineer loyal to his company. I remembered his happiness when he shared with me that he received very positive feedback from his manager, teammates. I know this means a lot to him after what had happened in 2018. When he changed the job, he told me he was confident that he had followed all the company's policies, and let me relax.

Now the case is moving on to the end, and our family still have stringent realities to face:

1.  My husband is the only income source. He works hard to support our daily life, two kids' education expenses, to make sure we are financially safe. If he were incarcerated, we would lose all the income source and this would be a big crisis to us.

2.  I went to nursing school and obtained my license as Licensed Vocational Nurse. As a nurse needs to work on site, it would be impossible for me to maintain a full-time job while still being able to take care of our two little kids alone. I don't have any relatives in United States to help me. I am the only child in my family, my parents are both in China.

3.  My son has chronic cough over a year and we had over 40 doctor's appointments including couple urgent care visits, several diagnostic tests, 4 procedures in the past one year. We saw 5 specialties at Stanford, until now we still can't find the cough reason,

which means we still need to frequently see the doctors to figure out the problem in the future. A full time job plus benefits is crucial to us for his health condition. As a mom, I saw my son suffer a lot from his disease, not only from the cough interrupting his daily life but also from the uncomfortable procedures, I will do anything I can to let him feel better.

4. Based on the counselor and psychiatrist, the love and support from both parents are quite important for my son's ADHD treatment, and a complete family is the foundation. I do not know what change it could be to him if his dad left. The health concern of my son is a life-long concern, we need to visit the doctor frequently and find or adjust the treatment methods, we also need to work with the school to make sure he is in the right environment. This will need a lot of time, energy and patience.

5. Currently my husband is still a green card holder, if there were any custody time, it would trigger the deportation process for him. If he were deported, our family would be separated. He never worked in China before, so there'll be a lot of uncertainties (especially on kids education, medical treatment).

Therefore, I deeply understand that his role is not only to provide financial support, there is much more in the kids 'growth. I deeply hope this letter can help your honor to know more about our family and consider facts that we are facing. I have attached our family photo below.

Sincerely,

Qianqian Shi

